OPINION
Defendant-Appellant Ray E. Padgett appeals the trial court's denial of his motion to suppress evidence. He claims that the procedure used by the Beavercreek Police Department in identifying him from a photograph was impermissibly suggestive and prejudicial to his defense.
The record reveals that on August 12, 1998, Beavercreek police officer Eric Grile was patrolling a shopping area that had recently been plagued by a rash of automobile break-ins. Grile noticed a white male sitting in a parked car that was in an otherwise empty area of the parking lot and, after seeing that it had no front license plate, he decided to circle the car to check for a rear license plate. Just as Grile began to position himself so he could view the rear license plate area, however, the driver of the car pulled past him and drove to another area of the parking lot where he came to a stop near a Burger King. Grile was able to see the driver's face as they passed each other in their cars. Grile followed the car, still trying to catch a glimpse of the rear license plate, but when he drew near, the driver again drove away and stopped in another part of the parking lot. While unable to see the rear license plate, Grile got "a very good look" at the driver in the Burger King parking lot. Grile's next attempt to check for a rear license plate met with the same result, except that this time, Grile and the driver of the car made eye contact, and the driver waved to Grile.
 As Grile maneuvered his patrol car around for a fourth try, he saw the other car exiting the parking lot at a high rate of speed, so he activated his lights and siren and gave chase. The other car was weaving recklessly between lanes and into opposing traffic. Before long the car struck another vehicle, but continued on anyway. When Grile realized the driver wasn't going to yield to his authority, he decided it was unsafe to continue pursuit of the car with lights and siren and he deactivated them. A short time later, Grile spotted the car, unoccupied and abandoned, approximately one-eighth of a mile from where the accident took place. The car was towed to the police department, its contents were inventoried, and fingerprints were lifted from the vehicle and some of the forty or so compact disks that were found in the car with their security devices intact; the prints were sent to the Miami Valley Regional Crime Laboratory. The next day, Grile discovered that the car and the rear license plate that was affixed to it had been stolen from different individuals.
Grile's investigation of the case was put on hold while he waited for the fingerprint report to come back from the crime laboratory. Apparently, that process took five or six months after which Grile was informed that the fingerprints lifted from the compact disks belonged to Ray. E. Padgett. He also learned that Padgett had been arrested in Miami Township at about the time that the events just described took place, and he took steps to get a copy of the booking picture taken of Padgett. Upon receipt of the picture, Grile immediately recognized Padgett as the driver of the car involved in the events of August 12, 1998. Padgett was subsequently arrested and charged with two counts of receiving stolen property, to wit, the stolen car and the stolen license plate, and one count of failure to comply with an order of a police officer.
On July 20, 1999, Padgett filed a motion to suppress in which he contended his "stop" was illegal and that the method by which Grile had identified him was impermissibly suggestive. After a hearing, the trial court denied Padgett's motion and Padgett pled no contest to all three counts of the indictment. He was found guilty on all counts by the trial court; his resulting sentences amalgamate to a seventeen-month term of imprisonment after their concurrent nature is taken into account. Padgett's timely appeal followed.
In his brief to this court, Padgett asserts two "arguments" that we will construe as assignments of error. See App.R. 16(A)(3). Oddly, his first such error is advanced by his counsel in the form of an Anders argument. See Anders v. California
(1967), 386 U.S. 738. Anders briefs (not arguments), however, are appropriate when appellate counsel has conscientiously concluded that there are no issues to be raised that merit consideration by the appellate court. Id. If appellate counsel determines there are any issues warranting appellate review, even if there is only one, discussion of non-meritorious issues is neither appropriate nor desirable. Were it otherwise, this court would be required to provide appellants with an opportunity to present their own pro se
briefs addressing issues already determined by their appellate counsels to be devoid of merit. While this is a proper procedure in situations where counsel has decided that any appeal would be frivolous, it is not where the appellant's attorney has found an issue or issues worthy of review. For these reasons, we decline Padgett's counsel's invitation to review what he essentially advances as (non-)error.
Padgett's second assignment of error is set forth as follows:
 A single photo identification occurring six months following the incident by the investigating officer seeking a face to match other recovered evidence is premia [sic] facia [sic] suggestive and should be suppressed.
 In his second assignment of error, Padgett argues that Grile's procurement of a single photograph of Padgett, and his identification of Padgett therefrom, constituted an impermissibly suggestive identification procedure which rendered both Grile's identification of Padgett from the photograph and Grile's subsequent in-court identification of him at the suppression hearing unreliable. Initially, we note that in its answer brief, the State argues that Padgett did not request exclusion from evidence of the identification itself in his motion to suppress, and that as a consequence, that issue is not properly before this court. On page two of his motion, however, Padgett specifically claimed that the procedure used by Grile in identifying Padgett from the photograph violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article 1 of the Ohio Constitution. We find the matter is, therefore, properly before us on appeal. We now turn to the issue raised by Padgett's second assignment of error.
"To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was unnecessary and `so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances." State v.Booker (Nov. 24, 1999), Montgomery App. No. 17709, unreported, quoting Manson v. Brathwaite (1977), 432 U.S. 98, 106; Neil v.Biggers (1972), 409 U.S. 188, 199; State v. Broom (1988), 40 Ohio St.3d 277,284. The United States Supreme Court has acknowledged that the danger of an incorrect identification is increased where only one photograph is displayed to a witness. Simmons v.United States (1968), 390 U.S. 377, 383. Even where a photographic identification procedure is found to have been impermissibly suggestive, however, it does not invariably lead to the conclusion that the defendant's due process rights have been violated. Instead, the question becomes whether under the totality of the circumstances the identification was reliable even though the identification procedure was suggestive. Biggers, supra at 199.
Here, the procedure Grile used in identifying Padgett from a single photograph was inherently suggestive and was unnecessary since there were no exigent circumstances and a photo array could easily have been prepared and presented to him by his fellow officers. See Manson, 432 U.S. at 99 (stating single-photo identification by undercover police officer was both suggestive and unnecessary); State v. Battee (1991), 72 Ohio App.3d 660, 662
(finding single-photo identification procedure was both suggestive and unnecessary and that it has been widely condemned, citingStovall v. Denno (1967), 388 U.S. 293, 302); State v. Smith (Mar. 23, 1994), Montgomery App. No. 13908, unreported (recognizing an element of suggestiveness in presentation of single photograph of suspect to police officer who purchased drugs from suspect while working undercover). But see Booker, supra (rejecting the notion that single-photograph identifications by undercover police officers is per se suggestive); State v. Wogenstahl (Nov. 30, 1994), Hamilton App. No. C-930222, unreported (concluding that single-photo identification on the heels of a tentative identification from photo array was not impermissibly suggestive). Thus, we next consider whether Grile's identification possessed aspects of reliability sufficient to justify its admission into evidence.
Whether an identification is reliable can be determined by assessing the likelihood of misidentification given the circumstances surrounding the identification. In Neil, supra, the Supreme Court articulated five factors to be considered in making such an evaluation: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation or identification; and (5) the length of time between the crime and the confrontation or identification.409 U.S. at 199; Broom, supra at 284.
At the suppression hearing, Grile testified that he saw Padgett's face three times during their "game of cat and mouse," as Padgett puts it, in the parking lot. Grile stated that he got a "very good look" at the driver of the car the second time they passed one another in their cars, and even made eye contact with him on the third pass. One of the times, the driver waived to Grile. Curiously, neither party questioned Grile as to whether it was day or night during the encounter, nor did they elicit from him what the lighting conditions were in the parking lot during the relevant time. Consequently, it is impossible for us to discern from this record under what conditions Grile got his "good look" at the driver. Furthermore, we recognize that a look described as "good" that is gotten in daylight is qualitatively different from a "good look" gotten at night. Nevertheless, the burden of showing Grile's identification was unreliable is Padgett's, and he did not bring forth any evidence at the suppression hearing to suggest that Grile's observations of Padgett's face, brief though they may have been, were anything but clear and unobstructed.
Turning to the second of the five factors listed in Neil, we find that the degree of attention given by Grile to the driver of the car was great. Padgett correctly notes that Grile was intent on catching a glimpse of the rear license plate at the time he and the other driver were maneuvering in the parking lot. That is not to say, however, that Grile's attention was at all times focused on the rear license plate area instead of the driver's face, because it appears that Grile was never able to position his patrol car behind the suspicious vehicle. On the contrary, from the record it appears that Grile had more of a chance to catch sight of Padgett's face than he did to see the rear license plate of the car. In fact, Grile did not get the license plate number until he had located the car after it had been abandoned. Moreover, courts have recognized in this context that police officers, through their training, experience, and knowledge that their claimed observations might later be subject to close examination at any trial, can be expected to pay scrupulous attention to detail. Manson, 432 U.S. at 115; State v. Guster
(1981), 66 Ohio St.2d 266, 272; Battee, 72 Ohio App.3d at 664;State v. Price (Aug. 7, 1989), Fayette App. No. CA89-01-002, unreported. See also State v. Smith (Mar. 23, 1994), Montgomery App. No. 13908, unreported (noting that witness was a trained police officer). Thus, this factor adds to rather than detracts from the reliability of Grile's identification of Padgett as the driver of the car.
Next, we note that Grile never described the driver of the car any more specifically than as a white male. The record does not reveal Padgett's race, but even if we presume he is a white male, and that Grile's description was absolutely accurate on that score, we cannot conclude that the reliability of Grile's identification is enhanced by this factor. At least some degree of specificity is necessary for an accurate description of a suspect to add to the reliability of an identification.
As for the fourth and fifth factors, Grile's identification of Padgett was unequivocal in both his out-of-court and his in-court identifications of Padgett as the car's driver. As noted above, however, five or six months had elapsed between Grile's observation of Padgett in the parking lot and his identification of him from the photograph sent by the Miami Township Police. InNeil, supra, the Supreme Court noted that a seven-month lapse between the crime and the identification "would be a seriously negative factor in most cases." 409 U.S. at 201. There, however, the Court found that the witness' failure to make any identification of the suspect from previous line-ups, show-ups, or photographic showings indicated she had resisted the suggestiveness of the identification procedure from which she was ultimately able to identify her assailant. No such circumstances are present here.
Whether Grile's identification of Padgett under the circumstances discussed above was so unreliable that it deprived Padgett of due process is a close question. On the one hand, Grile was able to get one "good look" at Padgett, and to see Padgett's face on two other passes by the car Padgett was driving, once even making eye contact. In addition, Grile is trained to notice details that might otherwise escape a casual observer, and was unequivocal in his identifications of Grile from the photograph and from the witness stand. On the other hand, however, Grile's pre-identification description of Padgett was so general and indistinct that it is scarcely a description at all. Moreover, that Grile's identification came approximately five months after what were certainly less-than-leisurely looks at Padgett gives cause for concern as to its reliability. Under the totality of circumstances, however, we are not convinced that Grile's identifications of Padgett from the photograph and from the witness stand were so unreliable that there was a substantial likelihood of misidentification, and we overrule Padgett's second assignment of error.
Having found Padgett's first assigned error to be no assertion of error at all, and having overruled his second assignment of error, the judgment of the trial court is affirmed.
 ________________________________ FREDERICK N. YOUNG, J.
WOLFF, J. and FAIN, J., concur.